### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**vs.**                                                                             **Cr. No. 09-3445 JH**

**ESTHER FLORES-BRISENO,**

        **Defendant.**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on *Defendant Flores-Briseno's Motion to Suppress* [Doc. No. 22]. On February 17, 2010, the Court held an evidentiary hearing on the motion. Rhonda Backinoff represented the United States, and James Baiamonte represented the Defendant, who was present. After hearing the evidence and considering the arguments of the parties, the Court concludes that the motion should be granted in part and denied in part.

### FACTS

For the purpose of the motion to suppress, the Court finds the following facts. On November 8, 2009, Defendant Esther Flores-Briseno was aboard Greyhound bus #1360 traveling east from Los Angeles, California to St. Louis, Missouri, which made a stop in Albuquerque. Leonard Pedroncelli was an AKAL security officer who was providing security services to Greyhound on a contract basis. While at the Albuquerque bus station, Pedroncelli was supervised by Brian Castro, a Greyhound employee. Neither Castro nor Pedroncelli has any relationship with the Albuquerque Police Department, nor does either one receive any compensation or direction from APD with regard to drug interdiction.

When bus #1360 arrived at the station, Pedroncelli stood by while the passengers unloaded, directing them toward the terminal as was his usual practice. When all the passengers (including Defendant) were off the bus, a man approached Pedroncelli and told him that there were narcotics or other drugs on the bus. Specifically, the man stated that the drugs were in a black computer bag seven rows back from the front of the bus, in the top luggage rack. The tipster appeared sober, but Pedroncelli did not ask his name or request any identifying information from him. The man had bags with him, so Pedroncelli assumed that he had been a passenger on the bus. Pedroncelli asked the tipster to "stay put" while he went to speak to his supervisor, Castro. Pedroncelli then informed both Castro and the bus driver of what the tipster had told him. Then, Pedroncelli went to look for the man who had informed him about the drugs on the bus, but he was gone.

By this time, the bus had been moved to the service garage for cleaning and refueling. When it returned to the terminal, Pedroncelli and Castro boarded the bus. They went to the location on the bus described by the tipster, where they found a black computer bag matching his description.[1] Castro opened the bag and found three blue, shoe-shaped plastic bundles which they suspected contained a controlled substance. At that point, Castro used his cell phone to call 911. He looked inside the bag for identifying information, but found none. Castro then closed up the black computer bag and put it in the same place where he had found it, and both men got off the bus, locking the doors so that no one could exit or enter.

A few minutes later, Officer Michael Engh and Officer Burton from the Albuquerque Police Department ("APD") arrived at the bus station. Castro boarded the bus with the police officers and

---

[1] There is a sign at the Albuquerque bus station alerting passengers that they and their bags may be searched at any time, and a similar warning appears on the ticket envelopes that Greyhound provides to its passengers.

showed them where the black bag was located. Castro then grabbed the bag from its location in the overhead storage rack and opened it for the police, who examined the contents, including the three blue, shoe-shaped packages. They tried to open one package but were unable to do so. However, it appeared to contain a yellow paste and smelled like mustard. The officers had never seen items like those before. While they were on the bus, APD Officers Timothy Apodaca and Gustavo Gomez arrived and joined the others onboard.[2] Officer Gomez, who is trained in drug recognition, identified the blue bundles as brown heroin.

      The officers expressed an interest in determining who owned the black computer bag. Castro suggested that they tell the passengers that the bus was broken down and that they needed to move their bags onto a different bus. In that way, officers could see who owned the bag. The APD officers agreed to the plan, and accordingly Castro informed the passengers that the bus had a mechanical problem and instructed them to get their bags from inside the bus and transfer them to another bus nearby. While the passengers were doing that, it was Pedroncelli's job to keep an eye on the suspicious black bag and to notify the police as soon as someone made contact with it. Standing outside the bus on the driver's side, Pedroncelli was able to see the bag. Similarly, Castro was in a position to observe the bag as well. Both Pedroncelli and Castro observed a Hispanic man[3] with a red hooded sweatshirt get on the bus, pick up the bag briefly, look around suspiciously, and then put the bag back in its place. The man in the red sweatshirt was the last person on the bus. Pedroncelli then watched the man exit the bus without any bags whatsoever. Pedroncelli and Castro immediately notified APD officers of what they had seen. In the meantime, the man in the red

---

[2] All four APD officers on the scene were in uniform and carrying visible firearms.

[3] It was suggested in the briefs that this man was the co-defendant, Cesar Leon-Vega. However, at the hearing the parties presented no testimony or other evidence as to his identity.

sweatshirt entered the terminal and walked east. Castro saw the Defendant with the man in the red hooded sweatshirt outside the terminal. He asked her if she knew him, and she said that she did not. Castro asked her to step inside the terminal so that he and the police could do their jobs. She complied and went inside.

The police officers made contact with the man in the red hooded sweatshirt at the east side of the terminal building. Officer Engh saw the Defendant entering the terminal from the outside, near the man in the red hooded sweatshirt. At some point, Officers Apodaca and Gomez arrived, and Apodaca asked Defendant if she knew the suspect. She said that she did not. A moment later, Gomez told Apodaca that he had seen the Defendant talking with the man in the red hooded sweatshirt. Pedroncelli confirmed that he too had seen the Defendant with the man in the red sweatshirt. Defendant was seated inside the terminal. Engh and Apodaca brought her outside the terminal, handcuffed her, and told her "You are being detained pending further investigation." While Engh was outside the terminal with the Defendant, but after he had already detained her, Castro ran up and informed them that additional blue, shoe-shaped bundles had been found in additional abandoned baggage on the bus. There is no evidence in the record that police were able to connect that baggage with the Defendant or the man in the red sweatshirt at that time.

Officer Engh then placed Defendant in the back seat of Officer Apodaca's police vehicle, from which she could not exit unless a police officer released her. He read Defendant her rights under *Miranda*. Engh communicated with Defendant in English, and she appeared to understand what he was saying. She did not appear drunk or high, and she seemed to be of at least average intelligence. Engh did not use force or coercion against her. After he advised Defendant of her constitutional rights, she agreed to speak with him. At that point, Defendant made statements incriminating herself, the man in the red hooded sweatshirt, and a third individual. After Defendant

had been placed in handcuffs, police located her bus ticket, along with those of the two other suspects.[4] These tickets confirmed that all three departed from the same location and were headed to the same destination on the same bus. APD officers transported Defendant to the police substation, where they questioned her further.

## DISCUSSION

### I. DEFENDANT'S REQUEST TO SUPPRESS THE FRUITS OF THE SEARCH OF LUGGAGE ON THE BUS

In her brief in support of her motion to suppress, Defendant argues that the "initial search was done in violation of [her] Fourth Amendment rights and the subsequent luggage searches should be suppressed as fruits of the initial illegal search." Doc. No. 22 at ¶ 4. However, it is well-established that "the Fourth Amendment is a personal right that must be invoked by an individual." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *see United States v. Rubio-Rivera*, 917 F.2d 1271, 1274 (10th Cir. 1990). Therefore, a defendant raising a Fourth Amendment challenge must first demonstrate that she has standing to object to the search. *Rubio-Rivera*, 917 F.2d at 1274. Standing requires the defendant to show "that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable." *United States v. Rhiger*, 315 F.3d 1283, 1285 (10th Cir. 2003) (quoting *United States v. Higgins*, 282 F.3d

---

[4] Officer Engh testified that he received this information about the bus tickets <u>after</u> placing Defendant in handcuffs and putting her in the back of the police car, but then later testified that he was not sure when he received that information. In contrast, Officer Apodaca testified that he and other officers reviewed the bus tickets while speaking with Defendant outside the terminal <u>just before</u> they detained her. Based on the testimony at the hearing, the Court concludes that once police approached Defendant and the man in the red sweatshirt at the bus terminal, events moved rather quickly, leaving little time or opportunity to compare the bus tickets before Defendant's arrest. Thus, the Court finds credible Officer Engh's initial testimony that the officers did not have the information from the bus tickets when they placed Defendant in handcuffs and put her in the police car.

1261, 1270 (10th Cir. 2002)). In this case, Defendant objects to the search of the black computer bag, which was searched initially by Pedroncelli and Castro, and then later searched by police. The United States has pointed out that Defendant has no privacy interest in the black computer bag, as it did not belong to her. Further, at the beginning of the hearing Mr. Baiamonte acknowledged that "standing might be an issue in this case," and at no point during the hearing did Defendant present any evidence that she has standing to contest the search of the black computer bag, or for that matter, any other luggage on the bus that was found to contain contraband. "The burden of proof is on the defendant to demonstrate that [s]he has a reasonable expectation of privacy in the place searched to establish h[er] standing." *United States v. Johnson*, 584 F.3d 995, 998 (10th Cir. 2009). Thus, the Court will deny Defendant's motion to suppress the fruits of this search because Defendant lacks standing to challenge it.

In the alternative, Defendant challenges the constitutionality of the initial search of the black computer bag on the grounds that the private citizens who conducted the search, Pedroncelli and Castro, were acting at the behest of the government (thereby subjecting the search to the constraints of the Fourth Amendment), but lacked probable cause search the bag without a warrant.

The Fourth Amendment protects citizens from unreasonable searches and seizures by government actors. *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921). It is clear that the Fourth Amendment does not apply to searches by private parties, absent governmental involvement. *See United States v. Smythe*, 84 F.3d 1240, 1242 (10th Cir. 1996). In *Smythe*, the court explained that

> in some cases a search by a private citizen may be transformed into a governmental search implicating the Fourth Amendment if the government coerces, dominates or directs the actions of a private person conducting the search or seizure. In such a case, the private citizen may be regarded as an agent or instrumentality of the police, and the fruits of the search may be suppressed.

84 F.3d at 1242 (internal citation and quotation omitted). In this case, the Court concludes that Pedroncelli and Castro's initial search of the black bag was a purely private search for which no probable cause was necessary. The record is devoid of evidence that any government actor knew of, acquiesced in, or controlled the initial search. Furthermore, there is no evidence that Pedroncelli or Castro performed the search to assist law enforcement efforts. To the contrary, the evidence suggests that it was Greyhound's policy to search passenger bags whenever it deemed such a search necessary, and that Pedroncelli and Castro performed the search on their own initiative. Therefore, the search was not subject to the constraints of the Fourth Amendment.

Defendant also suggests that the subsequent search of the black computer bag, in which Officers Engh and Burton participated, violated her Fourth Amendment rights. Aside from the fact that Defendant lacked a privacy interest in the bag as discussed above, the Court concludes that police did have probable cause to participate in the subsequent search. Specifically, the police had evidence that the tipster had made a specific description of the bag and where it could be found on the bus, and that the bag contained drugs. The police also had evidence that a bag matching that description had been found in the precise location on the bus described by the tipster, and a private search by Pedroncelli and Castro had revealed the bag to contain three blue, shoe-like packages containing a substance which Castro suspected to be illegal drugs. Thus, the police had probable cause to search the black computer bag.

For these additional, alternative reasons, the Court will deny Defendant's motion to suppress the fruits of the searches of the black computer bag.

## II. DEFENDANT'S REQUEST TO SUPPRESS HER STATEMENTS TO POLICE

Defendant also moves to suppress her statements to police, which she contends were the

7

result of an illegal arrest without probable cause. The threshold issue before the Court is to determine whether Defendant was subject to an investigatory detention, or to a full arrest, at the time she made her statements to police.

The undisputed facts are that Officer Engh escorted Defendant out of the bus terminal, placed handcuffs on her, and confined her in the back of Officer Apodaca's police car—a private, secure location. She was physically restrained and not free to leave. The United States characterizes this as an investigatory detention. However, the Tenth Circuit has held that "[a]n arrest is distinguished" from an investigative detention "by the involuntary, 'highly intrusive' nature of the encounter." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007). For example, "the use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest." *Id.* at 1115-16 (quotation, alterations omitted). For example, in *Cortez* the Tenth Circuit found that the defendant had been arrested, and not merely detained, when police grabbed him, pulled him from the doorway of his home, placed him in handcuffs, advised him of his *Miranda* rights, confined him in the back seat of a locked patrol car, and questioned him there. *Id.* at 1116.

Of course, the Tenth Circuit has also observed that "the use of firearms, handcuffs, and other forceful techniques does not *necessarily* transform a *Terry* detention into a full custodial arrest—for which probable cause is required—when the circumstances reasonably warrant such measures." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (internal quotation marks omitted) (emphasis added). For example, the Tenth Circuit has suggested that concerns for officer safety may warrant the use of constraints, such as handcuffs, without transforming the detention into an arrest. *See, e.g., United States v. Bennett*, 329 F.3d 769, 774 (10th Cir. 2003); *United States v. Shareef*, 100 F.3d 1491, 1502 (10th Cir. 1996). However, in this case there is no evidence (and no

argument from the Government) that the circumstances of Defendant's arrest justified handcuffing her and confining her in the back of a police car in order to ensure officer safety or for any other purpose. In light of the evidence before it, the Court concludes that this exceeded the scope of an investigative detention and was, in fact, an arrest.

Next, the Court must determine if the arrest of Defendant was constitutional. "If a police-citizen encounter exceeds the limits of a *Terry* [investigative] stop, the detention becomes an arrest that must be supported by probable cause." *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1227 (10th Cir. 2008) (quotation omitted); *see also United States v. Copening*, 506 F.3d 1241, 1248 (10th Cir. 2007); *Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008) (stating that a warrantless arrest violates the Fourth Amendment unless the arrest is supported by probable cause). "In evaluating the existence of probable cause, we consider whether the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Id*. (quotation omitted). "Our determination on this score is an independent and objective one. Thus an officer's own subjective reason for the arrest is irrelevant, and it does not matter whether the arrestee was later charged with a crime." *Id.* Here, Defendant argues that probable cause to arrest her was lacking, because all she did was talk to Leon-Vega, which is not a crime. She contends that otherwise, police had no evidence linking her to the illegal drugs found in the black briefcase. She posits that her subsequent confession was not voluntary but rather was the fruit of an illegal arrest.

A review of the evidence presented at the hearing reveals that at the time police placed Defendant under arrest, they knew that she had spoken with the man in the red sweatshirt (who in turn had handled the black bag containing the suspected narcotics) at the bus terminal. The police

also knew that Defendant had denied knowing the man in the red hooded sweatshirt. Finally, they knew that additional blue, shoe-shaped bundles had been found in several unclaimed, unidentified bags onboard the bus. While this information would amount to reasonable suspicion to conduct an investigative detention of the Defendant in order to gather more information, it does not rise to the level of probable cause to believe that she had committed a crime. Accordingly, the arrest violated the Fourth Amendment, and the statements that Defendant made to the police after her arrest will be suppressed.[5]

**IT IS THEREFORE ORDERED** that *Defendant Flores-Briseno's Motion to Suppress* [Doc. No. 22] will be **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Court denies Defendant's motion to suppress the fruits of the search of the black computer bag, but grants the motion to suppress her statements to police after her arrest without probable cause.

_____
**UNITED STATES DISTRICT JUDGE**

---

[5] In the alternative, the Court concludes that even if the officers had known, at the time they arrested Defendant, that her ticket showed that she was traveling to and from the same cities as the man in the red sweatshirt, they still would not have had probable cause to believe that she had committed a crime.